## BUTLER *v.* BUTLER.

Where a respondent, in her answer to a libel for divorce, alleges cruel and barbarous treatment, whereby she is forced or justified in absenting herself from the habitation of her husband, and seeks to justify a desertion on that ground; the libellant would have a right, previous to the trial, to demand and receive of the respondent a written specification of the acts of cruelty by which she intends to support such general allegation; with the times, places, and circumstances of their occurrence, as far as they can reasonably be given.

The general practice in the English Ecclesiastical Courts will not be adopted by the Court of Common Pleas in divorce cases, arising under our Act of Assembly of 1815.

Where the withdrawal of a wife or husband from mutual cohabitation has been the result of agreement; or where the withdrawal of one has received the subsequent approbation of the other, the continuity of absence under such circumstances is not a wilful and malicious desertion. Such assent or acquiescence in a desertion are revocable acts. And if either party persists in a state of separation after such revocation, he or she henceforth would occupy the position of a party quitting cohabitation on his or her own motion.

The *reasonable cause* which will justify a wife or husband in quitting and abandoning each other, is that which would entitle the party so separating him or herself to a divorce.

That cruelty within our state which entitles a wife to a divorce from her husband, is actual personal violence, or the reasonable apprehension of it; or such a course of treatment as endangers her life or health, and renders cohabitation unsafe; and the latter may exist without the former.

So a husband may, by a course of humiliating insults and annoyances, practised in the various forms which ingenious malice could readily devise, eventually destroy the life or health of his wife, although such conduct may be unaccompanied by violence, positive or threatened. The cruelty is judged from its effects; not solely from the means by which those effects are produced.

*Jan.* 22. THIS was a libel for a divorce, brought by Pierce Butler, libellant, *v.* Frances Ann Butler, respondent.

The only ground set forth in the libel was wilful and malicious

42        2 E 2

desertion, without reasonable cause, from the habitation of the libellant. It was in the common form. To this libel the respondent put in an answer. First, she denied that she had, on the day set forth in the libel, or at any time before or since, *wilfully and maliciously deserted* and absented herself from the libellant and his habitation. The answer then proceeded, and stated that it was true that on the 10th day of September, 1845, she did leave and absent herself from the habitation of the libellant, and that she has ever since been absent. The answer then proceeds, and denies that such leaving of his habitation was a desertion within the provisions of the law; because that, for a long time anterior to the day mentioned in the libel, the libellant had separated himself from her, as a husband, and had withdrawn himself from her. The answer then proceeds to state that, in consequence of his wrongful, cruel, and unlawful conduct towards her, while she was in his habitation performing her duties as a wife, she would, under the law of the state, have been justified in quitting his house without the legal consequences of a desertion.

The answer also stated, that when she did leave his habitation and society, and absent herself, it was with his assent, and license, and subsequent approval, and acquiescence therein, and continuance thereof.

The answer also stated, that for a long space of time before she left his habitation, the conduct of the libellant was such as was designed and calculated to force her to withdraw from his society and habitation.

The respondent further set forth in her answer, that she would have been justified in absenting herself from the society, fellowship, and habitation of the libellant without his license, approval, or acquiescence, because of his cruel and barbarous treatment, and offering such indignities to her person as to render her condition intolerable, and life burdensome, and thereby force her to withdraw from his house. The respondent then asked leave to submit what she called a narrative in support of the various allegations in the answer, and with her answer submitted a narrative, with the exhibits, which occupied about sixty printed pages of the paper-book. She then concluded her answer by asking an issue, that the facts might be tried by a jury.

The counsel for the libellant filed exceptions to the answer, and moved that the narrative, or historical sketch of the matrimonial difficulties between the parties, might be stricken from the record.

The cause was argued upon these exceptions by Messrs. *Cadwa-*

*lader* and *Dallas* for the libellant, and Messrs. *Gerhard, Meredith,* and Mr. *Choate,* from Boston, for the respondent.

The following opinion of the Court on the whole case was delivered by

KING, President.—The libellant in his libel, which is in the brief and sententious form peculiar to our practice, sets forth that his wife, the respondent, did, in violation of her matrimonial obligations, on the 11th of September, 1845, wilfully, maliciously, and without reasonable cause, desert and absent herself from him and his habitation, and since that time has continuously persisted in such desertion and absence. It concludes with a prayer for the divorce from the bond of matrimony, given by the Act of Assembly to the injured party, under such circumstances. To this libel, the respondent, Frances Ann Butler, has answered—in which answer she first denies that, on the 11th day of September, 1845, or at any other time before or since, she had wilfully and maliciously deserted and absented herself from the libellant and his habitation. She then proceeds to state that it was true, and that she therefore admits, that she did leave and absent herself from the habitation of the libellant on the 10th day of September, 1845, and that she has ever since remained so absent. But she denies such leaving and absence to have been desertion. First, because, for a long time previous, the libellant had separated himself from her as a husband, and because of his wrongful and unlawful conduct towards her while in his habitation, which would have justified her in quitting it without incurring the legal consequences of desertion. Secondly, because she had the assent and license of the libellant, so to quit his habitation, and absent herself from it, and his subsequent approval and acquiescence therein; and also, because his conduct to her for a long space of time before she so quitted and absented herself, was designed and calculated, and such as to force her therefrom. Thirdly, because she would have been justified in so absenting herself without such license, approval, acquiescence, or design, by the libellant's cruel treatment of her, and by such personal indignities offered by him to her as rendered her condition intolerable and life burdensome. She then "craves leave to submit" what she terms a "narrative in support of these allegations," which "narrative," with its subjoined exhibits, occupies near sixty printed pages. At the conclusion of this narrative, she asks that her cause may be tried by a jury, on an issue or issues to be framed for that purpose; a right given to her by Act of Assembly.

Independent of this historical sketch of matrimonial discords, the answer, like the libel, would have been in perfect concord with our simple, facile, and convenient practice in the administration of the divorce laws.   It would have been the brief, but clear and precise assignment of causes, why the respondent had quitted and absented herself from the common habitation, and the negation, that such quitting and absence was a wilful and malicious abandonment of her marriage duties.   The parties would thus have reached a complete issue, and the cause, according to our practice, been ripe for a hearing, either before the Court, if a jury trial had not been asked, or before a jury, if such a claim had been interposed.

Previous, however, to proceeding to trial, the libellant would have had the right to demand, and receive of the respondent, a written specification of the acts of cruelty, or other circumstances, by which she proposed supporting her general allegations ; with the times, places, and circumstances of their occurrence, as far as these could be reasonably and practically given.   The giving of such notice would not have made the facts contained in it evidence of course in the cause.   On the trial, all such matters as should have been deemed inadmissible on the ground of irrelevancy or inadequacy, could have been objected to when offered, and would have been admitted or rejected by the Judge who presided at the trial, according as he considered the objections taken valid or otherwise.

Why this course has not been pursued—this regular, usual, and orderly course—arises from the useless introduction of Mrs. Butler's " narrative" into the answer, which the libellant seeks to treat as if it were a responsive allegation in an English Ecclesiastical Court. In these Courts, facts intended to be relied upon by parties to divorce cases, are stated in the pleadings at length, broken, however, into separate portions, technically termed *Articles ;* in which the facts are alleged under separate heads, according to the subject-matter, or the order of time in which they have occurred.  Before such articles are admitted to proof, it is competent to the adverse party to object to their admission, either in whole or in part; in the *whole,* when the facts altogether, if taken to be true, will not entitle the party propounding the articles, to the demand which he makes, or to support the defence which he sets up ; in *part,* if any of the facts pleaded are irrelevant to the matter in issue, or could not be proved by admissible evidence, or are incapable of proof.

These objections are made and discussed before the Ecclesiastical Judge, who admits an article to proof, or rejects it, according as he may be of opinion, that it exhibits a legal cause of complaint,

or proposes to offer legal proof of such a legal cause, or otherwise. If the parties state candidly the facts capable of proof, they can thus take the opinion of the Judge, in the first instance, whether, in such a case as the one proposed to be proved, the party complaining has any legal remedy for his supposed wrong; or whether the testimony by which he proposes establishing it, is relevant or adequate for that purpose.

From the decision of the Ecclesiastical Judge, admitting or refusing proof of an article, an appeal lies to a higher tribunal. The libellant, as has been observed, treating the "narrative" introduced into the answer as a responsive allegation in an Ecclesiastical Court, has replied to it, *first*, by what he terms an "additional allegation, with objections to the defendant's answer and allegation;" *second*, by "responsive and additional allegations as to part of the defendant's allegations;" and, *third*, by "objections to the defendant's allegations;" which counter-pleading occupies twenty-seven pages of the printed paper-book. This, with the sixty pages of the answer, makes a pretty formidable exhibition of ecclesiastical pleading, which it is, however, *possible*, might be admissible in those Courts. But we are in a Pennsylvania court of law, administering a Pennsylvania statute, the course of procedure under which has been familiarly known throughout the Commonwealth for a long series of years. If we should agree with the libellant, and treat the respondent's "narrative" as a regular ecclesiastical responsive allegation; if we should reject it, or order its reformation, by directing it to be subdivided into articles; or if, dispensing with that form, we should arrange the respondent's alleged facts ourselves, and proceed to consider and decide upon their relevancy, their adequacy, or their legal capability of proof, we of course fall at once into the practice of the English Ecclesiastical Courts; and as there cannot be two. systems of procedure under the same law, we abolish our own. Where this change would end; how the Supreme Court would be able to revise our proceedings; whether, if our judgment in a given case rejecting an article should be reversed, that Court would take proof of such rejected article, or order the case back to this Court with directions; are questions which might be multiplied, in order to show the difficulties that would arise from such a radical change in our practice as that proposed in this case. If anything was wanting to convince us of the total inexpediency of changing our simple and convenient system, for the voluminous and expensive one of Doctors' Commons, the record before us would furnish a crying evidence of it. If any

would be benefited by the change,. which we doubt, it certainly would not be the good people of this Commonwealth, whose truest interests are best subserved by laws plainly and intelligibly expressed, administered through forms simple, facile, and inexpensive. If articled and detailed facts are requisite in an answer, they must be equally so in the libel, and such is actually the ecclesiastical practice. Of consequence, by such a system, the volume of the proceedings must be immensely extended, the expenses enhanced, determinations delayed, and relief made practically inaccessible to those for whose protection laws are specially framed: the feeble, the poor, and the oppressed.

In her denial of the wilful and malicious desertion charged against her in the libel; in assigning the libellant's license and cruelty as justificatory reasons for her departure from the common habitation; the respondent did all she was required to do, in order to demand that this fact should be tried by jury. If specially called upon before such trial for precise statements of the facts intended to be relied upon by her to sustain her answer, and which the libellant may regard as too generally charged therein, she is bound to furnish them. All the matter, however, introduced into the answer in the shape of a "narrative," is pure surplusage;—a statement of facts, some of which would, and some of which would not be received in evidence on the trial. It is therefore not the subject of exception, either as to its form or substance. Being extraneous to the formal record, it must be stricken from it. The exceptions of course fall with it. The case is thus brought back to its true and simple elements, and made to assimilate its features to the hundreds of other analogous causes which occupy the Courts of the Commonwealth. The libel will then charge against the respondent a wilful and malicious desertion, without reasonable cause, of her husband and his habitation, persisted in for two years. The answer will deny such wilful and malicious desertion, and assert that an admitted quitting of, and absence from, the common habitation, by the respondent, was licensed by the express assent of the libellant, or justified by law from *reasonable* causes supervening, viz. unkind treatment and cruelty on the part of the husband. The issue between the parties under our practice will be thus completely formed, and ripe for trial by jury. On the trial, the jury must decide whether such abandonment of the common domicil was with the previous license and assent, or subsequent approbation and approval of, the husband; or, if the respondent fails in establishing this position, whether the unkind treatment and cruelty

of the husband towards her was of that character which formed a reasonable cause for her departure.

In thus determining that the cause has been submitted to us in a manner which does not regularly raise the questions of fact so elaborately discussed, we are not to be understood as in the slightest degree expressing any opinion on the merits of the controversy. When the case has been submitted to a jury; when the facts on both sides have been fully heard, the time will have arrived for such an expression of opinion. *Before,* such expression would be certainly premature, and might be grossly unjust. Indeed, it scarcely could be otherwise than unjust, because it would be formed on a one-sided view of the subject.

Here this judgment might close; but as several legal propositions have been discussed before us, which, of necessity, must arise on the trial of the jury issue, it is proper we should express our opinions in regard to them, as rules for the future conducting of the cause.

The first of the propositions is this :—Suppose the evidence to establish, that the respondent left her husband's habitation with his license and assent, or continued her absence with his subsequent acquiescence and approval, what would be the legal effect of either on the libellant's cause ? Although no Court determining on the marriage relation, recognises such consent-separations as arrangements strictly legal; yet, when it is clearly shown that the withdrawal of a wife or husband from mutual cohabitation, has been the result of *such* an understanding or agreement; or where the withdrawal of one has received the subsequent approbation of the other, the continuity of absence under such circumstances is not a "wilful and malicious desertion." The malice of the desertion arises from its being the perverse act of the one, in refusing the performance of the matrimonial obligations and duties, which the other has the legal right to require. But when such separation has been the result of mutual arrangements, and these clearly established in proof, then each are in equal fault in this particular, and neither can claim a legal right against the other, in consequence of an act in which he or she has been an equal participant. Such assent or acquiescence, however, are revocable acts.

And if either party persists in a state of separation after such revocation, he or she thenceforth occupies the position of a party quitting cohabitation on his or her own motion. In the celebrated case of the Earl of Westmeath *v.* The Countess of Westmeath, 2 Haggard's Rep. Supplement, a previous separation by formal arti-

cles was considered as not in any way affecting the legal relation between the parties, so as to prevent a decree for the restitution of conjugal rights. As a deed of separation upon mutual agreement on account of differences, though containing a covenant not to bring a suit for restitution of conjugal rights, such articles are held to offer no impediment to such a suit. To this effect are also the cases of Smith *v.* Smith, and Fletcher *v.* Fletcher, cited in Westmeath *v.* Westmeath. But so long as the consent on which the original absence was founded, or continued in, is not withdrawn, a continuity of the absence ·is not desertion within our Act of Assembly. Of course, if either party has the legal right to separate from the other, for causes which lawfully justify such separation, and subsequently a consent-separation takes place between them; a withdrawal of that consent by the aggressor, will leave the party aggrieved in no worse position than that originally occupied. A refusal to renew cohabitation, would be justified or otherwise, according to the state of things which preceded the separation.

The next question agitated involves the construction of the clause in the Act of Assembly which defines desertion. This is said to take place "where either party shall have committed wilful and malicious desertion, and absence from the habitation of the other, without reasonable cause, for and during the space and term of two years." What is meant by the phrase "*reasonable cause?*" On the one hand it is insisted, that reasonable cause means such a cause as would have enabled the absenting party to have obtained a divorce, if, instead of quitting cohabitation, the latter had assumed a more active position and asked for a divorce. On the other, it is argued, the reasonable causes of this law are not definable by any precise rule, but are such causes as in any case submitted will satisfy a court or jury that the separation was a justifiable act.

In every point of view in which this question can be examined, it is one of grave magnitude. Too liberal a construction given to the words "reasonable cause" could not fail to invite to separations between husband and wife, which otherwise never might occur; while a construction too limited might subject the party most meriting legal protection, because most needing it, to hardships and suffering which are revolting to the feelings of every right-minded man. But when the solution of questions of this embarrassing nature is presented to public functionaries charged with the maintenance and conservation of social morality, they always should be considered with reference to this fundamental truth :—That laws, framed for the government of the whole people, must look to the

good of the whole; and that we should be satisfied with their operation when it best promotes the *general* moral order of civil society, even though in a particular case it may produce apparent hardship. That the general moral order is best promoted by discountenancing matrimonial separations, unless for weighty and substantial causes, is undisputed and indisputable; at the same time the public weal is thus best served; the true interest of the immediate parties, the happiness and respectability of their common offspring, the feelings of those united to them by the ties of kindred and affection, are most effectually advanced and protected. Controversies easily settled in the domestic forum, when it is known that the law expects of married persons mutual concessions, forbearance, and even submission to great wrongs, often would, under a different legal system, end in disastrous and permanent separations, disgraceful to the parties, distressing to their children, and humiliating to their friends. "When," says a great Judge, "people understand that they must live together, except for a few reasons known to the law, they learn to soften by mutual accommodation the yoke which they know they cannot shake off; they become good husbands and good wives, from the necessity of remaining husbands and wives; for necessity is a powerful master in teaching the duties it imposes."

From this course of reflection we are led to adopt the doctrine, that the reasonable cause which will justify wife or husband in quitting and abandoning each other, is that, and only that which would entitle the party so separating him or herself to a divorce. This is the doctrine of the English Ecclesiastical Courts, which, long under the presidency of the finest minds of that country, are rich sources from which we may extract principles, however we may differ in the mode of applying them. When in that country cohabitation is suspended by husband or wife, by his or her own authority merely, *without a sufficient reason* for the act, the aggrieved party is entitled to the aid of the Ecclesiastical Courts, in enforcing a restoration of the duties of mutual cohabitation. This remedy is technically called a restitution of conjugal rights. In its application it has ever been held, that nothing can be offered in bar to the wife's return to her husband, except such facts as would entitle her to a divorce, in case she had brought a suit against him for a separation: Holmes *v.* Holmes, 2 Lee Rep. 116; Oliver *v.* Oliver, 1 Haggard Consistory Rep. 361; Dysart *v.* Dysart, 1 Robertson's Ecc. Rep. 106; Coote's Practice in Ecc. Courts, 367. These cases decide a principle precisely analogous to that which we have adopted. A principle, practical in itself, and appreciable by every

43                              2 F

one to whom it is stated ; a principle as well supported by authority as recommended by sound morality.

The opposite doctrine, by creating no standard by which a proposed reasonable cause is to be measured, leaves that to the arbitrament of the judge or the jury, in each case as it arises. Of course, under such a system, or such absence of all system, decisions would vary with the varying temperaments, characters, and education of men. To-day it would be decided that a given state of facts affords reasonable cause for a wife quitting her husband ; to-morrow, the same facts, before another tribunal, would be held not to be reasonable cause for a husband quitting his wife. Thus would the obligation of a contract, in the maintenance of which in full vigour and integrity society is most deeply interested, be left in a state of the most intolerable vagueness and uncertainty. Such a system would not fail to invite adventurers in this judicial lottery. But the opposite doctrine, instead of inviting separations for light and frivolous causes, will render them unwise and inexpedient, because they *may* compromise, but never *can* advantage the guilty party. The practical working of such a doctrine argues most cogently against its soundness. It would continually present the spectacle of the abandonment of marital duties by one party, for causes confessedly inadequate to entitle him or her to a divorce ; and yet so far recognised by the law, as to exempt the party quitting cohabitation from any legal liabilities consequent on the act. It would be throwing back such parties on society, in the undefined and dangerous position of a wife without a husband, and a husband without a wife. It would maintain the marriage contract in force, and yet afford no means of enforcing its obligation in cases where it would be admitted that no adequate cause existed for its dissolution. The rule, therefore, that repudiates such *quasi* dissolution of the matrimonial union by the act of either husband or wife, is the rule alike of sound law, right reason, and social morality.

The remaining subject of examination is the construction of that clause of the Act of Assembly which gives a divorce to a wife " when the husband shall have, by cruel and barbarous treatment, endangered his wife's life, or offered such indignities to her person as to render her condition intolerable, and life burdensome, and thereby forced her to withdraw from his house and family." What is meant here by " cruel and barbarous treatment, endangering life ?"—" indignities to the person, rendering the condition intolerable, and life burdensome ?" Do they mean the positive infliction of personal sufferings, or the threat of them ; or do they embrace

those wounds of the spirit, which rudeness, austerity, petulance, or ill-temper can inflict?

How far the idea of marital cruelty may be safely carried, considered with regard to its adequacy to the legal separation of husband and wife, has been a subject much considered by jurists of all civilized nations. All have felt that it ought to be viewed as a practical question, affecting the most interesting of social relations, and one not to be determined rashly or impulsively. The difficulty of defining the exact line, between that which is legal cruelty, adequate to separate judicially husband and wife, and those painful domestic broils which courts cannot regard as sufficiently serious for such intervention, has always been admitted. Sir William Scott, in his great judgment in Evans v. Evans, 1 Haggard Cons. Rep. 35, " declines the task of laying down a direct definition of cruelty," contenting himself with what he terms negative descriptions, which though they show what is not cruelty, he considers " perhaps the safest definitions which can be given, under the infinite variety of possible cases that may come before the Court." Premising that it is the duty and inclination of Courts to keep the rule extremely strict, he declares " that the causes must be grave and weighty, and such as show an absolute impossibility that the duties of the married life can be discharged. In a state of personal danger, no duties can be discharged; for the duty of self-preservation must take place before the duties of marriage, which are secondary both in commencement and obligation; but *what falls short of this* is with *great caution to be admitted.*"

In enumerating these negative descriptions of cruelty, inadequate to justify a sentence of divorce, he declares that " what merely wounds the mental feelings is in *few cases* to be admitted, where they are not accompanied by bodily injury threatened or menaced." That " mere austerity of temper, petulance of manners, rudeness of language, a want of civil attention and accommodation, even occasional sallies of passion, *if they do not threaten bodily harm*, do not amount to legal cruelty." That it was " still less cruelty, where it wounds not the natural feelings, but the acquired feelings, arising from particular rank and situation; for the Court had no scale of sensibilities by which it could gauge the quantum of injury done and felt; and, therefore, though the Court would not absolutely exclude considerations of that sort, where they are stated as matters of aggravation, yet they cannot constitute cruelty where it would not have otherwise existed." In a summary of principles in the same cause he declares that he had " heard no case cited in

which the Court had granted a divorce without proof given of *rea-sonable apprehension* of bodily hurt, apprehension being enough; for the Court was not to wait till the hurt was actually done—but the apprehension must be reasonable, not an apprehension arising merely from an exquisite and diseased sensibility of mind." In Oliver *v.* Oliver, 1 Haggard Const. Reports, 361, he declares "that words of *mere present* irritation, however reproachful, will not enable the Court to pronounce a sentence of separation. Words of menace importing the *actual danger of bodily harm*, will justify its interposition." In Holden *v.* Holden, 1 Haggard Const. Reports, 453, he says " *everything* is in legal construction *cruelty* which *tends to bodily harm*, and in that manner renders cohabitation unsafe; wherever there is *tendency* only to bodily mischief, it is a peril against which the wife must be protected; because it is unsafe for her to continue in the discharge of her `conjugal duties." In Harris *v.* Harris, 1 Phillimore, 111, he says that " it is not the habit of the Court to interfere in mere domestic quarrels, there must be something which makes cohabitation unsafe." In Waring *v.* Waring, 2 Phillimore, 132, he asserts the " definition of legal cruelty is that which *may endanger the life* or *health* of the party." In this case he adds to his previous enumeration of negative descriptions of cruelty, the charge against the husband of forbidding to his wife any intercourse with her own family. " For," says he, " although it might be a harsh exercise of the husband's authority, yet he might be justified in denying such intercourse; that although a woman might be amiable, her connexions might not be so; that there might be many reasons to justify a husband in denying such intercourse, and that though it might be harsh, it would be going too far for the Court to interfere." Although, in the view of this true founder of the modern English law of divorce for the cause of cruelty, causes which involve the life or health of the sufferer are essential to justify the intervention of the Court, he cautiously avoids saying that these results can, in the eye of the law, *only* flow from actual personal violence, or the threat of it.

In selecting causes of ordinary occurrence, which he repudiates as inadequate to constitute legal cruelty, he leaves himself uncommitted as to the "infinite variety of possible cases which might come before the Court" under this head. In rejecting "what merely wounds the mental feelings," he confines himself to that which is "not accompanied with bodily injury either actual or menaced." In pronouncing that " mere austerity of temper, rudeness of manner, a want of civil attention and accommodation, and

even occasional sallies of passions" are in themselves insufficient causes, he speaks of those which do not "threaten bodily harm." When, in Holden *v.* Holden, he describes as legal cruelty "*every* thing which *tends* to bodily harm, and in that manner renders cohabitation unsafe," he does not limit the otherwise generality of this language by an imprudent attempt at defining what would be such, under all possible circumstances. And when in Waring *v.* Waring he apparently departs from the cautious path he had previously marked out for himself, and attempts to define affirmatively legal cruelty, he does so in language sufficiently broad to leave his former positions unshaken. It is to be *that* which "*may endanger the life or health of the party.*" In Westmeath *v.* Westmeath, Sir Christopher Robinson, observing on the past cases, says in his conclusion from them all, "that the Ecclesiastical Courts have hitherto been uniformly strict in requiring *proof of actual injury or of real apprehension of injury,* as it may affect the *safety or health* of the person, to justify divorce on the ground of cruelty." But still we do not understand this Judge as saying that personal or threatened personal violence, are the only facts which could afford the evidence necessary to establish this state of things in any and every case.

In Neild *v.* Neild, 4 Haggard Consistory Reports, 265, Dr. Lushington, the presiding Judge, held, that "the *main test* to be applied to the consideration of the libel was whether all the facts assuming them to be true, with which Mr. Neild was charged, were of a nature and description to *satisfy* his mind that cohabitation could no longer subsist between the parties without personal danger to Lady Caroline Neild." "Where," said he, "a strong conviction exists in the mind of the Court that the personal safety of the wife is in jeopardy, or where even ·it may seem reasonable ground to apprehend such a consequence, it is its bounden duty to protect the wife from such risk and danger." It is true that to this principle, which is in harmony with the previous doctrines of Sir William Scott, he adds: "that in these suits the species of facts most generally adduced are: First, personal ill treatment, which is of different kinds—such as blows or injury of any kind. Secondly, threats of such a description as would reasonably excite, in a mind of ordinary firmness, a fear of personal injury. For causes less stringent than these, the Court has no power to interfere and separate husband and wife."

In Dysart *v.* Dysart, 1 Robertson's Ecclesiastical Reports, 106, the same Judge decided against the wife, apparently applying these

principles. But in the same case (page 111) he holds that the refusal by a husband to furnish a wife with "necessaries and comforts" within his pecuniary means, and suitable to the wife's education and habitudes, was an act of legal cruelty. He very correctly confines himself to "necessaries and comforts," not luxuries and enjoyments. And holds that as to everything beyond "necessaries and comforts," the husband, so far as the law is concerned, is the sole judge; that no human tribunal has authority to interfere, and none could interfere with real benefit to the public interest.

The judgment in Dysart v. Dysart came before the Court of Arches on an appeal; when it was reversed by Sir H. Jenner Fust, and the Countess of Dysart held to have established an adequate cause of divorce. The Judge, after stating the general doctrine, previously laid down by Sir William Scott in Evans v. Evans, that "mere austerity of temper, petulance of manner, rudeness of language, even occasional sallies of passion, *if they do not* threaten bodily harm, do not amount to legal cruelty," says, "From this I deduce this inference; if austerity of temper, petulance of manner, rudeness of language, a want of civil attention and accommodation, occasional sallies of passion, do threaten bodily harm, they amount to legal cruelty." See London Jurist, March, 1848, page 492.

The general doctrine of the English Ecclesiastical Courts, with regard to the divorce for the cause of cruelty, has received the approbation of the most eminent jurists, and the most learned Courts of the Union. In New York it was recognised and adopted by Chancellor Kent in Barriere v. Barriere, 4 Johns. Chan. Rep. 189, and by Chancellor Walworth in Perry v. Perry, 2 Paige's Chancery Rep. 502; by the Supreme Court of Connecticut in Shaw v. Shaw, 17 Connecticut Reports, 189; by the Supreme Court of Kentucky in Finley v. Finley, 9 Dana's Reports; and by the Supreme Court of Massachusetts in Warren v. Warren, 3 Mass. Rep. 321.

Divorces, or rather separations for cruelty, *sævitia*, were proceedings familiar to the Courts of Continental Europe, and were regulated by principles similar, though not as stringent as those of the English Canonical Code. The system under the code of the old French Monarchy, before the Revolution, is treated of by the learned Pothier in his "Traité du Contrat du Mariage," partie 6, chapitre 3, page 269. "The separation of habitation," says this writer, "is the relief which, for just causes, is accorded by the Judge to one of the parties from the obligation of living with the other, and performing conjugal duties, without, however, severing

the marriage tie." Discussing the principles on which this law should be administered, he says, "The union of husband and wife, which is formed by God, does not permit to a woman to demand the separation of habitation, if it is not *for very great causes.*" What are just causes, he admits, is not easy to determine, but holds they are to be left to the arbitrament and prudence of the Judge. Proceeding to enumerate what causes have been held sufficient, he *first* refers to cases of bad treatment, where the husband has struck or attempted to strike his wife; these being the most ordinary causes of separation. *Second,* to cases of bad treatment which had not gone to this extent. As an example of this kind adequate to authorize a divorce, he gives the case of the wife of a public officer. The husband, he says, had never struck his wife or offered to strike her, but from the first year of their marriage, and during all those which followed, he never ceased to testify towards her the greatest contempt, on all occasions, before persons who frequented his house, before the domestics, and even before their children, whom the father excited to ridicule their mother. *Third,* cases of the refusal by the husband, through inhumanity towards his wife, to furnish to her in a state of infirmity the necessaries of life, although he had the means to do so. *Fourth,* the accusation of a capital crime prosecuted calumniously against his wife by the husband.

The modern French code of divorce approximates-very nearly to our own. The absolute divorce, among other causes, is given by the Code Napoleon for "violence, ill usage, or grievous insults of one of the spouses towards the other." The words of the code are " *Les exces, sevices ou graves injures, del'un epouse envers l'autre.*" These words, like those of our own statute, are somewhat vague and general. But the French tribunals have assigned to them definite meanings. "Les exces," are said by Poullier (Le Droit Civil Français, vol. 2, p. 41), to be acts of violence which exceed all measure, and may put the life of the spouse in danger. "Les sevices" are acts of cruelty which do not put the life in danger. "Injures graves," such insults as tend to destroy the reputation of the outraged spouse, that attack her probity, her morals; and that *harsh words will not suffice.*

These citations are of value in showing the practical construction given by an enlightened nation to a code analogous to our own; and so far are useful aids in the construction of kindred enactments.

Aided thus by the lights derived from foreign and domestic juris-prudence, we approach the construction of our own statute with less diffidence. And that construction in our opinion is this : That the cruelty within our statute which entitles a wife to a divorce from her husband, is actual personal violence or the reasonable apprehension of it ; or such a course of treatment as endangers her life or health, and renders cohabitation unsafe. The latter may exist without the former. The denial of " necessaries and com-forts" by a husband to his wife, he having the means to furnish them, would certainly endanger her life and health, though done in the blandest way. Of course, "luxuries and enjoyments" are different things from " necessaries and comforts" within the com-pass of the husband's means. What luxuries and elegant enjoy-ments a husband shall extend to his wife, are matters referable. to his own generosity and liberality, with which no Court can inter fere on any rational or practical principle. The case of Dysart v. Dysart, 1 Robertson, 111, shows this to be the present doctrine of the English Canon Law Courts, and was that of the French Code a century ago, as we have shown by Pothier.

Again, a husband may, by a course of humiliating insults and annoyances, practised in the various forms which ingenious malice could readily devise, eventually destroy the life or health of his wife, although such conduct may be unaccompanied by violence, positive or threatened. Would the wife have no remedy in such circumstances under our divorce laws, because actual or threatened personal violence formed no element in such cruelty ? The answer to this question seems free from difficulty, when the subject is con-sidered with reference to the principles on which the divorce for cruelty are predicated. The Courts intervene to dissolve the mar-riage bond under this head, for the conservation of the life or health of the wife, endangered by the treatment of the husband. The cruelty is judged from its effects ; not solely from the means by which those effects are produced. To hold absolutely that if a husband avoids positive or threatened personal violence, the wife has no legal protection against any means short of these, which he may resort to, and which may destroy her life or health, is to invite such a system of infliction by the indemnity given the wrongdoer. The more rational application of the doctrine of cruelty is to con-sider a course of marital unkindness, with reference to the effect it must necessarily produce on the life or health of the wife ; and if it has been such as affect or injure either, to regard it as true legal cruelty. This doctrine seems to have been in the view of Sir H.

Jenner Fust, in Dysart *v.* Dysart, when he states he deduces as an inference from what Sir William Scott ruled in Evans *v.* Evans, that " if austerity of temper, petulance of manner, rudeness of language, a want of civil attention, occasional sallies of passion, *do threaten bodily harm, they do amount to legal cruelty.*" This idea expressed axiomatically would be no less than the assertion of this principle : that whatever form marital ill-treatment assumes, if a continuity of it involves the life or health of the wife, it 's legal cruelty. The principle of Dysart *v.* Dysart is not only important, as being the most recent expression of opinion on this subject in a high Ecclesiastical Court, but because the principle on which that cause is placed, is considered by the Judge as a just and necessary deduction from those settled by Sir William Scott in the earlier cases.

If these views are well founded, there is no real difference between our opinions on the question of legal cruelty, and those of the English Canon Law Courts as *now* understood and administered. But were it otherwise, we should still, with all becoming deference to these high authorities, adhere to our own convictions. In limiting our intervention in matrimonial causes, in which cruelty is charged, to cases in which life or health are in any way involved, we occupy safe and prudent ground. A case of this kind would present a different state of things from one of matrimonial discord produced by mere acerbity of temper, or rigidity of domestic discipline. In such cases Courts have most wisely refused to interfere, referring the parties to their domestic forums for the adjustment of their differences, and recommending to the aggressor, the improvement of his manners, and to the aggrieved, the remedies of decent resistance or prudent conciliation. The discrimination of mere domestic discords, from the species of malicious cruelty, on which we have perhaps too long commented, can readily be made by any tribunal to whom a trust of such magnitude is confided.

It was ingeniously argued by the respondent's counsel, that the words " indignities to the person," in our statutes, were words equiva-- lent to *personal indignities ;* and that therefore acts which could bo classed under that category, were acts for which a divorce could be granted under our law. If this argument is sound, then undoubt edly personal insults and reproachful language would be causes of divorce, because they rank among the grossest personal indignities. This construction, it will be perceived, would introduce into our code as a cause of divorce the " injures graves" of the Code Napoleon ∙ for to this exactly would the result of such a construction arrive.

44

It is quite certain that our law does not, in terms, make this one of the causes for the dissolution of the marriage bond; and it seems to us clear that no just principle would authorize the Courts to do so under the pretext of construction.    The words "shall offer such indignities to her person," are the equivalents of the offered or threatened violence of the English Canon Law, or the "*services*" of the Code Napoleon, and do not embrace the causes of "injures graves"—grievous insults.   The English Canon Laws, like our own, have always refused to regard mere personal insults as adequate causes for the separation of husband and wife; regarding such a doctrine as tending too greatly to relax a social bond, which, from before the time of Tacitus, the Saxon race have considered a sacred institution.    "When," says that Roman historian, speaking of the manners of the Germans, "the bride has fixed her choice, her hopes of matrimony are closed for life.   With one husband, as with one life, one mind, one body, every woman is satisfied; in him her happiness is centred; her desires go no farther; and the principle is not only an affection for her husband's person, but a reverence for the marriage state."

The Court have thus noticed all the points by them deemed material in the cause.   Its future course will be that indicated : viz. trial by jury on the bill and answer.